

# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA

## Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Case No.: 1:15MJ76 |
| ) | |
| JOSE PENA, GENESI LEDESMA ) | |
| ) | |
| Defendants. ) | |

## AFFIDAVIT IN SUPPORT OF ARREST WARRANT AND CRIMINAL COMPLAINT

I, Michael S. Triglia, of the Federal Bureau of Investigation ("FBI"), Washington Field Office ("WFO"), Washington, D.C., (hereinafter "Affiant") being duly sworn, depose and state the following:

### I. Introduction

1. I am a Special Agent with the FBI and have been so employed since June 2008. I am currently assigned to a squad which investigates Criminal Enterprises and Violent Gangs out of the WFO, Northern Virginia Resident Agency, and I have been assigned to this squad since March 2013. Prior to this, I was assigned to the Hostage Rescue Team and also a Healthcare Fraud squad out of the New York Field Office where I mainly investigated prescription narcotics abuse. I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516(1) of Title 18, United States Code. As a part of my official duties, I

am responsible for investigating criminal violations of federal narcotics laws, including, but not limited to, violations of Title 21 of the United States Code.

2. During my law enforcement career as a Special Agent of the FBI, I received training and experience in major criminal investigations to include narcotics and healthcare fraud. I have participated in numerous criminal investigations. More specifically, I have conducted physical surveillance, executed search warrants, analyzed phone and internet records, and arrested drug traffickers. I have also spoken to confidential sources, suspects, defendants, witnesses, and other experienced investigators concerning the methods and practices of drug traffickers, as well as the inner workings of major drug trafficking organizations. I have participated in numerous arrests that later led to convictions. I have also directed or participated in numerous searches of residences, businesses, and vehicles of suspects involved in a variety of criminal activity. As a result of my training and experience, I am familiar with how various drugs are used and the typical distribution and trafficking patterns generally utilized by drug dealers and traffickers.

3. I have also become knowledgeable about the enforcement of state and federal laws pertaining to narcotics and dangerous drugs. Based on this experience, I have become well versed in the methodology utilized in narcotics trafficking operations, the unique trafficking patterns employed by narcotics organizations, as well as patterns of drug abuse. I have also participated in interviews of suspected drug dealers. During these interviews, the drug dealers have explained their schemes to use and launder drug proceeds and their methods of operation. I have also spoken with other FBI and Drug Enforcement Administration ("DEA") agents and police officers who have related to me the substance of their similar experiences and the results of their own investigations and interviews. Based upon this experience, I have become

knowledgeable of the methods and modes of narcotics operations, and the language and patterns of drug abuse and trafficking. I have written reports, analyzed records and documents, and been the affiant on arrest and search warrants.

4. During my employment with the FBI and local law enforcement, I have gained knowledge in the use of various investigative techniques including the utilization of wiretaps, physical surveillance, undercover agents, confidential informants and cooperating witnesses, the controlled purchases of illegal narcotics, electronic surveillance, consensually monitored recordings, investigative interviews, financial investigations, the service of administrative and grand jury subpoenas, and the execution of search and arrest warrants.

5. This affidavit is being submitted in support of arrest warrants and a criminal complaint charging JOSE PENA, also known as "EL FLACO" (hereinafter PENA) and GENESI LEDESMA, also known as "EL GORDO" (hereinafter LEDESMA) with conspiracy to possess with intent to distribute: a mixture and substance containing cocaine, a Schedule II controlled substance in violation of Title 21, United States Code, Section 846.

6. The facts and information contained in this affidavit are based upon my personal knowledge of the investigation, information obtained from other state and federal law enforcement officers, and information provided by confidential sources (CS-1 and/or CS-2). All observations referenced in this affidavit that were not made by me were related to me by the person who made such observation.

7. This affidavit contains information necessary to support probable cause. The information contained in this affidavit is not intended to include each and every fact and matter observed by me or known to the government.

## II. Reliability of Information

8. CS-1 has been has been cooperating with the FBI since August 2012. CS-1 is cooperating with law enforcement for financial compensation. CS-1 has prior felony drug and money laundering convictions, in addition to convictions for DUI and one misdemeanor conviction for fraud in 1996. CS-1 has been paid approximately $31,500 by the FBI since August 2012. CS-1 has never been found to be unreliable, and has consistently provided credible and reliable information that has been corroborated through other investigative methods.

9. CS-2 has been cooperating with the FBI since September 2009. CS-2 is cooperating with law enforcement for financial compensation. CS-2 has a prior conviction for the sale of a controlled substance in 2004. CS-2 has been paid approximately $17,340 by the FBI since September 2009. CS-2 has never been found to be unreliable, and has consistently provided credible and reliable information that has been corroborated through other investigative methods.

10. CS-1 and CS-2 have worked jointly with the FBI in the past and, in this instance, CS-1 set up the below transaction via an Unindicted Co-Conspirator (UCC-1) in Colombia known as "TOMMY" (hereinafter referred to as TOMMY). TOMMY put CS-1 in contact with PENA so that CS-1 and CS-2 could sell cocaine to PENA. CS-2 then conducted the transaction set forth below at a location within the Eastern District of Virginia on December 18, 2014. CS-1 and CS-2 have arranged at least two similar transactions in the past where they were ostensibly kilogram-level cocaine dealers. During these deals, CS-1 and/or CS-2 arranged for the sale of cocaine in exchange for U.S. currency which would be brought by individuals initially introduced through TOMMY. The FBI has seized over $180,000 (to include the below transaction) from operations of this nature with CS-1 and/or CS-2.

### III. Probable Cause

11. On or about Monday, December 15, 2014, CS-1 conducted a telephone conversation with PENA by calling PENA at telephone number ending in 6002. CS-1 stated to PENA "They told me that three for seven or four for ten, meaning the magazines." CS-1 is utilizing code in this statement to indicate that if PENA pays for three kilograms of cocaine, CS-1 will "front" PENA an additional four kilograms of cocaine. Similarly, if PENA pays for four kilograms of cocaine, CS-1 will "front" PENA an additional six kilograms of cocaine. Additionally, during this conversation, CS-1 states that "It will be ready for Thursday" and "You have the car prepared and all of that for that, right?" PENA replies "100 percent" and CS-1 and PENA agree to meet later that day (December 15, 2014). Based on my training and experience, it is known that drug dealers/distributors often use code to speak about cocaine and other narcotics. In the above conversation, CS-1 talks about "magazines" but has relayed to law enforcement that this (magazines) is code for kilograms of cocaine. It is also known, based on my training and experience, that kilogram quantities of cocaine are distribution-level quantities and not solely for personal use.

12. On or about December 15, 2014, CS-1 met with PENA and LEDESMA at a location outside the Eastern District of Virginia in order to discuss an upcoming narcotics transaction that they planned to occur on Thursday, December 18, 2014. CS-1 begins the conversation by asking PENA and LEDESMA what type of vehicle they have and whether or not the vehicle is good to "hide and all that." CS-1 is told the vehicle is "an Infinity," that the vehicle has plates "From Pennsylvania," and that "the more expensive the vehicle, the less they suspect, nobody puts that shit on a good vehicle." During this conversation, based on my training and experience, it is believed that PENA and LEDESMA are planning to use a particular

5

type of vehicle to avoid detection from law enforcement. In addition, CS-1 asks PENA and LEDESMA "So, are you going to want the seven? Or are you going to want the ten?" PENA replies "The ten." Based on information relayed to law enforcement by CS-1, it is believed that PENA was advising CS-1 that he wanted ten kilograms of cocaine. This conversation is also in reference to a previous telephone conversation described in paragraph 11 of this affidavit. In addition, CS-1 advised that LEDESMA was an active participant in the above conversation.

13. On or about December 17, 2014, CS-1 conducted a telephone conversation with TOMMY. CS-1 advised TOMMY that he/she (CS-1) already spoke with "EL FLACO/the skinny fellow" and TOMMY replied "Yeah, man, I know that." TOMMY further explained that PENA's "old man has-he has a lot of business connections." TOMMY asked CS-1 whether or not CS-1 was charging PENA $26,000 per kilogram of cocaine. CS-1 replied in the affirmative and TOMMY told CS-1 that he (TOMMY) "priced it at 27." This price (27) refers to the fact that TOMMY had already told PENA that the price per kilogram would be $27,000. CS-1 stated that "In any event, the important thing is that we're going to give it to them." Based on information relayed to law enforcement by CS-1, it is believed that "old man" or "father" means boss. It is also believed based on information provided by CS-1, that the above statement provided by TOMMY regarding PENA's "old man" is in reference to his (PENA's) boss' connections within the narcotics business.

14. On or about December 18, 2014, CS-2 met PENA and LEDESMA at a restaurant within the Eastern District of Virginia (EDVA) in order to conduct an exchange in which CS-2 was to give three (3) kilograms of cocaine to PENA in exchange for $85,000. Once CS-2 arrived at the aforementioned restaurant, CS-2 was greeted by LEDESMA (known to CS-2 as "EL GORDO") and was told by LEDESMA to go outside and that PENA would have the money for

CS-2. LEDESMA mentioned "tickets" to CS-2, and CS-2 informed law enforcement that "tickets" refers to money. LEDESMA also told CS-2 that LEDESMA was concerned that he had observed law enforcement in the area of the meet location. Based on my training and experience, I know that buyers and sellers of illegal drugs often use counter-surveillance measures prior to conducting drug transactions and look for law enforcement in the area. LEDESMA had arrived at the restaurant driving a Nissan Maxima. CS-2 then walked outside into the parking lot and met PENA at PENA's Infiniti vehicle. PENA retrieved a white plastic bag with U.S. currency from a "trap" under the passenger seat of PENA's vehicle and gave it to CS-2. PENA stated that he (PENA) only had $50,000 but would retrieve the rest of the money later that evening once CS-2 gave him (PENA) the cocaine. CS-2 then returned, with the plastic bag, to the restaurant and met briefly with LEDESMA. LEDESMA and CS-2 subsequently returned to their respective vehicles and an arrest was affected by Prince William County Police Department of LEDESMA, PENA, and an Unindicted Co-Conspirator (UCC-2). Physical surveillance was conducted by law enforcement during the above meet and exchange. In addition, CS-2 was searched prior to and directly after the operation. CS-2 provided law enforcement with the plastic bag which was found to have $48,990. An additional $3,278 was found in the rear pocket of PENA during the arrest and that money was also seized by law enforcement.

15. In addition, a search of PENA's Infinity vehicle found several cellular telephones and, when used to call a law enforcement telephone, the phone number of one of the cellular telephones registered as a number ending in 6002 through the caller identification feature of the law enforcement phone. The full phone number that registered was the same exact telephone number that CS-1 called on or about December 15, 2014, when CS-1 spoke by phone with

PENA. A search of LEDESMA's Nissan Maxima found a cellular phone with an assigned phone number that matched the phone number CS-2 provided for LEDESMA. This was determined by obtaining LEDESMA's phone number from CS-2, using a law enforcement phone to dial that number, and observing a cellular phone found in LEDESMA'S Nissan Maxima ringing and displaying the phone number of the law enforcement phone that was calling it.

IV. **Conclusion**

15. Based on the foregoing facts, there is probable cause to believe that from on or about December 15, 2014 up to and including December 18, 2014, in the Eastern District of Virginia and elsewhere, JOSE PENA and GENESI LEDESMA knowingly, unlawfully, and intentionally combined, conspired, confederated, and agreed with others, both known and unknown, to possess with intent to distribute a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge and belief.

Michael S. Triglia
Special Agent
Federal Bureau of Investigation

Sworn and subscribed to before me the ___6th___ day of ___Feb___, 2015.

/s/Thomas Rawles Jones, Jr.
~~MAGISTRATE~~
United States Magistrate Judge
Eastern District of Virginia